**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| CHAMBER OF COMMERCE OF THE | ) | |
| UNITED STATES and SOUTH | ) | |
| CAROLINA CHAMBER OF | ) | |
| COMMERCE, | ) | No. 2:11-cv-02516-DCN |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NATIONAL LABOR RELATIONS | ) | **ORDER** |
| BOARD, MARK GASTON PEARCE, in | ) | |
| his official capacity as Chairman of the | ) | |
| National Labor Relations Board, BRIAN E. | ) | |
| HAYES, RICHARD F. GRIFFIN, JR., | ) | |
| TERENCE F. FLYNN, and SHARON | ) | |
| BLOCK, in their official capacities as | ) | |
| Members of the National Labor Relations | ) | |
| Board, and LAFE SOLOMON, in his | ) | |
| official capacity as General Counsel of the | ) | |
| National Labor Relations Board, | ) | |
| | ) | |
| Defendants. | ) | |

This matter comes before the court on cross motions for summary judgment. The

Chamber of Commerce of the United States and the South Carolina Chamber of

Commerce (collectively, "plaintiffs") seek review of a final rule promulgated by the

National Labor Relations Board ("NLRB" or "the Board"). For over seventy-five years,

the NLRB has been nearly unique among federal labor agencies in not requiring

employers to post a general notice of employee rights in the workplace. On December

22, 2010, the Board changed course and issued a proposed rule: all employers subject to

the National Labor Relations Act ("NLRA" or "the Act") must post notices informing

employees of their rights under the NLRA. After completing a notice-and-comment

process, the Board published a final rule on August 30, 2011.  The rule is presently set to take effect on April 30, 2012.  As explained below, the Board, in promulgating the final rule, exceeded its authority in violation of the Administrative Procedure Act; therefore, the court grants summary judgment in favor of plaintiffs.

## I.  BACKGROUND

### A.  Procedural History

On September 19, 2011, plaintiffs filed a complaint for injunctive relief against the NLRB, Chairman Mark Pearce, Member Craig Becker, Member Brian Hayes, and General Counsel Lafe Solomon.[1]  By agreement, the parties filed cross motions for summary judgment on November 9, 2011.  The parties then filed responses in opposition on December 7, 2011.  On January 3, 2012, defendant Craig Becker's appointment as a Board Member expired, leaving only Chairman Pearce and Member Hayes on the Board.  Following recess appointments to the Board by President Barack Obama, on January 11, 2012, Sharon Block, Terence F. Flynn, and Richard F. Griffin, Jr. were substituted as defendants.  The court held oral argument on February 6, 2012.

### B.  The National Labor Relations Act

The NLRA, 29 U.S.C. §§ 151-169, governs labor relations between private sector employers, labor unions, and employees.  It "creates a system for the organization of labor with emphasis on collective bargaining by employees with employers in regard to labor relations which affect commerce."  Republic Aviation Corp. v. NLRB, 324 U.S. 793, 799 (1945).  Enacted in 1935, the NLRA was originally known as the Wagner Act after its sponsor, Senator Robert F. Wagner of New York, and was signed into law by

---

[1] A similar complaint was filed in the United States District Court for the District of District of Columbia.  Nat'l Ass'n of Mfrs. v. NLRB, No. 1:11-cv-01629-ABJ (D.D.C. filed Sept. 8, 2011).

President Franklin Delano Roosevelt.  Congress amended the Act in 1947, 1959, and 1974.  See Labor Management Relations Act ("Taft-Hartley Act"), Pub. L. No. 80-101, 61 Stat. 136 (1947); Labor Management Reporting and Disclosure Act ("Landrum-Griffin Act"), Pub. L. No. 86-257, 73 Stat. 519 (1959); Health Care Amendments, Pub. L. No. 93-360, 88 Stat. 395 (1974).  Congress also established the NLRB in 1935.  The NLRB is an executive branch agency that administers and enforces the NLRA, and consists of a Chairman, four Members, and a General Counsel, all appointed by the President with the advice and consent of the Senate.  The Board oversees various Regional Offices.

The first five sections of the Act are primarily structural.  Section 1 sets forth Congress's aspirations:  to address the "inequality of bargaining power between employees . . . and employers"; to "encourag[e] the practice and procedure of collective bargaining"; and to "protect[] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing."  29 U.S.C. § 151.  Section 2 defines certain terms in the Act.  Sections 3, 4, and 5 establish and lay out the composition of the Board, along with some of its authority and obligations.

Section 6 confers rulemaking authority on the Board:  "The Board shall have authority from time to time to make, amend, and rescind, in the manner prescribed by the Administrative Procedure Act,[2] such rules and regulations as may be necessary to carry out the provisions of this Act."  Id. § 156.

Section 7 lists the core labor rights of employees.  These include employees' rights "to self-organization"; "to form, join, or assist labor organizations"; "to bargain

---

[2] As discussed more fully below, the Administrative Procedure Act provides for judicial review of agency rulemaking efforts.  See 5 U.S.C. § 706.

collectively through representatives of their own choosing"; "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection"; and "to refrain from any or all such activities."  Id. § 157.

Sections 8 through 12 establish the Board's authority over unfair labor practice disputes and representation elections.  Sections 8 and 10 authorize the Board to investigate, prevent, and remedy "unfair labor practices," or "ULPs," that violate employees' Section 7 rights.  Congress prohibited five specific ULPs by employers, each of which is listed in Section 8.  ULP charges are subject to a six-month statute of limitations, which may only be tolled if the person filing a charge was delayed by reason of service in the armed forces.  Id. § 160(b).  Section 9 authorizes the filing of representation petitions, in which a petitioner alleges that a substantial number of employees wish to be represented by a union for collective bargaining.  Under Section 9, the Board may investigate questions of representation, conduct hearings, hold secret-ballot elections, and certify the results thereof.  Section 9(b) specifically requires the Board to decide the appropriate collective bargaining unit in each representation case.  Section 11 gives investigatory powers to the Board in relation to its authority under Sections 9 and 10.  Finally, Section 12 prohibits interference with the Board in the performance of its duties.  The remaining provisions of the Act are not relevant to the instant case.

Through this framework, Congress intended the NLRB to be a quasi-judicial body that "has two main functions:  to conduct representation elections and certify the results, and to prevent employers and unions from engaging in unfair labor practices."  NLRB, Basic Guide to the National Labor Relations Act 33 (1997), http://www.nlrb.gov/sites/

4

default/files/documents/224/basicguide.pdf.  "In both kinds of cases the processes of the NLRB are begun only when requested."  Id.  The Board readily acknowledges that it lacks "roving investigatory powers" and instead traditionally functions as a reactive agency.  76 Fed. Reg. 54,006, 54,010 (Aug. 30, 2011).  In its most recent Performance and Accountability Report, the Board stated, "The NLRB acts *only* on those cases brought before it, and does not initiate cases.  *All* proceedings originate with the filing of charges or petitions by labor unions, private employers, and other private parties."  NLRB, 2011 FY Performance and Accountability Report 12 (emphasis added).  The Acting General Counsel, Lafe Solomon, has explained that the "NLRB's processes can be invoked *only* by the filing of an unfair labor practice charge or a representation petition by a member of the public.  The agency has *no* authority to initiate proceedings on its own."  NLRB GC Mem. 11-03, 2 (Jan. 10, 2011) (emphasis added).

### C.  The Rule

On December 22, 2010, the NLRB published a Notice of Proposed Rulemaking in the Federal Register.  See 75 Fed. Reg. 80,410 (Dec. 22, 2010).  The Board proposed a rule requiring employers subject to the NLRA to put up posters in the workplace, which inform employees of their Section 7 rights under the Act.  The Board reasoned that a notice-posting rule was necessary because the NLRA was "almost unique" among major federal labor laws in not requiring employers to post workplace notices informing employees of their statutory rights and that most employees are unaware of those rights. Id. at 80,410-11.

The Board bypassed an Initial Regulatory Flexibility Analysis and Final Regulatory Flexibility Analysis under the Regulatory Flexibility Act ("RFA") by

certifying that the rule will not have a significant economic impact on a substantial number of small entities.  Id. at 80,415; see 5 U.S.C. § 605(b).[3]  Specifically, the Board determined that each employer subject to the rule will spend around $62.04 during the first year to comply with the rule—two hours per year, at an hourly rate of $31.02 paid to a professional or business worker—to acquire the notices, learn where and how to post them, and actually post them.  75 Fed. Reg. at 80,415.  The Board estimated that nearly six million small businesses will be affected but that the compliance costs incurred by each individual business will be de minimus.

Member Brian Hayes dissented from the Board's Notice of Proposed Rulemaking.  See id. ("[T]he Board lacks the statutory authority to promulgate or enforce [this] type of rule.").  Hayes also encouraged commentary on the Board's authority to promulgate the rule.

A public comment period followed, during which the Board received over 7000 submissions.  76 Fed. Reg. at 54,007.  On August 30, 2011, following an analysis of the public comments and partial modification of the proposed rule, the Board promulgated the final rule.  See id.  The effective date of the final rule was originally set for November 14, 2011, then extended to January 31, 2012, and extended again to April 30, 2012.  See 76 Fed. Reg. 63,188 (Oct. 12, 2011); 76 Fed. Reg. 82,133 (Dec. 30, 2011).

The final rule is divided into three subparts.  First, Subpart A requires "[a]ll employers subject to the NLRA [to] post notices to employees, in conspicuous places,

---

[3] When an agency publishes a notice of proposed rulemaking, the RFA requires the agency to prepare an Initial Regulatory Flexibility Analysis.  5 U.S.C. § 603.  Furthermore, when an agency promulgates a final rule, the RFA requires the agency to prepare a Final Regulatory Flexibility Analysis.  Id. § 604.  The requirements of Sections 603 and 604 do not apply if the head of an agency certifies that the rule will not have a significant economic impact on a substantial number of small entities.  Id. § 605(b).

informing them of their NLRA rights, together with board contact information and information concerning basic enforcement procedures." 29 C.F.R. § 104.202(a). Employers who customarily communicate with employees electronically on an intranet or internet site must also post the notice through those mediums. Id. § 104.202(f).

The poster that employers must post pursuant to Subpart A notifies employees of their Section 7 rights:  to form, join, or assist a union; to negotiate with an employer through a union; to bargain collectively through representatives of employees' own choosing; to discuss wages, benefits, and other terms and conditions of employment with co-workers or a union; to take action to improve working conditions; to strike and picket; or to choose not to do any of these activities, including joining or remaining a member of a union.  The poster also gives examples of illegal union conduct, notifies employees of a general six-month statute of limitations for filing a ULP charge, and provides contact information for the NLRB.

The rule does not end with the posting requirement.  Subpart B states that an employer's failure to post the notice "may be found to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by NLRA Section 7, 29 U.S.C. [§] 157, in violation of NLRA Section 8(a)(1), 29 U.S.C. § 158(a)(1)." 29 C.F.R. § 104.210. If the Board determines an employer is not in compliance, the employer "will be ordered to cease and desist from the unlawful conduct and post the required employee notice, as well as a remedial notice." Id. § 104.213(1).  The Board is also given discretion to suspend the Section 10(b) six-month statute of limitations for filing a ULP charge, "unless the employee has received actual or constructive notice that the conduct complained of is unlawful." Id. § 104.214(a).  Finally, the rule allows the Board to

consider an employer's "knowing and willful refusal to comply with the requirement to post the employee notice as evidence of unlawful motive in a case in which motive is an issue." Id. § 104.214(b).  Subpart C contains ancillary provisions.

In its final rule, the Board explained that this rulemaking effort diverges from the Board's traditional functions of issuing representation certifications and unfair labor practice orders.  The Board asserted it "is taking a modest step that is 'necessary to carry out the provisions' of the Act, 29 U.S.C. [§] 156, and that also fills a statutory gap left by Congress in the NLRA."  76 Fed. Reg. at 54,011.

Member Hayes again dissented, arguing the Board lacks authority to promulgate the rule.  Hayes reasoned that because Congress included notice-posting provisions in several other federal labor statutes but not the NLRA, Congress must have intended for the Board to lack the authority to issue this rule:  "Strangely, the majority does not merely contend that this pattern [of including notice-posting provisions] in comparable labor legislation fails to prove that Congress did not intend that the Board should have the rulemaking authority under Section 6 to mandate the notice posting at issue here.  They conversely contend that it proves Congress must have intended to confer such authority on the Board!" Id. at 54,038.

At the outset, it is important to note that the NLRA does not require employers to post general notices of employee rights under the Act.[4]  Conversely, Congress has

---

[4] The Board does require employees to be notified of their NLRA rights, but only in narrow circumstances, such as:  for three working days before a Board-conducted representation election; when an employer or union has been found to have violated employee rights under the NLRA; or when, under a union security clause, a union seeks to require non-union employees to pay dues, in which case the union must inform employees of certain rights, such as the right to refrain from union membership.  See 29 C.F.R. § 103.20(a); 75 Fed. Reg. at 80,411 n.5; 57 Fed. Reg. 12,985 (Apr. 13, 1992).

enacted or amended numerous other federal labor statutes to expressly require employers

to post notices of employees' statutory rights, as illustrated by the following chart:

| *Act* | *Year* | *Posting Requirement* |
|---|---|---|
| Railway Labor Act | 1934 | 45 U.S.C. § 152, Eighth |
| **Wagner Act** | **1935** | **None** |
| **Taft-Hartley Act** | **1947** | **None** |
| **Landrum-Griffin Act** | **1959** | **None** |
| Title VII of the Civil Rights Act | 1964 | 42 U.S.C. § 2000e-10 |
| Age Discrimination in Employment Act | 1967 | 29 U.S.C. § 627 |
| Occupational Health and Safety Act | 1970 | 29 U.S.C. § 657(c) |
| **Health Care Amendments** | **1974** | **None** |
| Migrant and Seasonal Agricultural Workers Protection Act | 1983 | 29 U.S.C. § 1821(b) |
| Employee Polygraph Protection Act | 1988 | 29 U.S.C. § 2003 |
| Americans with Disabilities Act | 1990 | 42 U.S.C. § 12115 |
| Family and Medical Leave Act | 1993 | 29 U.S.C. § 2619(a) |
| Uniformed Services Employment and Reemployment Rights Act | 2004 | 38 U.S.C. § 4334(a) |

**D.  Motions for Summary Judgment**

On November 9, 2011, the parties filed cross motions for summary judgment.

Plaintiffs argue the final rule violates the Administrative Procedure Act ("APA") because

the Board lacks authority to issue the rule under either Section 6 or the "gap" left by the

absence of a notice-posting provision in the NLRA.  Plaintiffs also claim the Board

exceeded its authority by creating a "new" ULP for failure to post the notice and by

authorizing tolling of the statutorily-mandated six-month statute of limitations for filing a

ULP charge.  Finally, plaintiffs contend that the notice poster violates the First

Amendment and that the rulemaking proceeding violated the RFA.

Defendants assert that the rule satisfies the APA because the Board has broad authority to promulgate the rule under Section 6 and to fill a statutory "gap" as to notice posting in the NLRA that Congress left for the Board to fill.  Defendants contend that the Board reasonably interpreted its authority under the NLRA and that such interpretation should be afforded substantial deference.  Defendants further argue that the rule's enforcement mechanisms—filing of a ULP charge for failure to post and equitable tolling of the Section 10(b) statute of limitations—are within the Board's authority.  Lastly, defendants argue the rule complies with the First Amendment and RFA.

The court received amicus briefs from thirty-six members of the United States House of Representatives, the Motor and Equipment Manufacturers Association, and Charles J. Morris, Esq.

## II.   JURISDICTION AND STANDARD OF REVIEW

Federal courts are courts of limited jurisdiction and must have subject matter jurisdiction over the litigation.  The APA allows for claims to be brought against a federal agency, such as the NLRB, in federal district court.  This suit also arises under and involves questions of the NLRA, First Amendment, and RFA; therefore, this court has federal question jurisdiction.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When cross motions for summary judgment are filed, the court "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law."  Rossignol v. Voorhaar, 316 F.3d

516, 523 (4th Cir. 2003) (internal quotation marks omitted).  The court finds that there

are no genuine issues of material fact and that the case may be decided as a matter of law.

The APA subjects final agency action to judicial review to determine whether it is

both supported by the administrative record and consistent with the APA.  5 U.S.C. §

704.  A reviewing court must "decide all relevant questions of law, interpret

constitutional and statutory provisions, and determine the meaning or applicability of the

terms of an agency action."  Id. § 706.  The court shall "hold unlawful and set aside

agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," id. § 706(2)(A); "contrary to

constitutional right, power, privilege, or immunity," id. § 706(2)(B); "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right," id. §

706(2)(C); "without observance of procedure required by law," id. § 706(2)(D); or

"unsupported by substantial evidence," id. § 706(2)(E).

"Regardless of how serious the problem an administrative agency seeks to

address, . . . it may not exercise its authority 'in a manner that is inconsistent with the

administrative structure that Congress enacted into law.'"  FDA v. Brown & Williamson

Tobacco Corp., 529 U.S. 120, 125 (2000) (quoting ETSI Pipeline Project v. Missouri,

484 U.S. 495, 517 (1988)).  Agency action "is always subject to check by the terms of the

legislation that authorized it; and if that authority is exceeded it is open to judicial review

as well as the power of Congress to modify or revoke the authority entirely."  INS v.

Chadha, 462 U.S. 919, 953 n.16 (1983).  At times, "more intense scrutiny" of agency

action is appropriate, such as where "the agency interprets its own authority," due to "the

unspoken premise that government agencies have a tendency to swell, not shrink, and are

likely to have an expansive view of their mission." Hi-Craft Clothing Co. v. NLRB, 660

F.2d 910, 916 (3d Cir. 1981).

> Reviewing courts are not obliged to stand aside and rubberstamp their
> affirmance of administrative decisions that they deem inconsistent with a
> statutory mandate or that frustrate the congressional policy underlying a
> statute. Such review is always properly within the judicial province, and
> courts would abdicate their responsibility if they did not fully review such
> administrative decisions.

NLRB v. Brown, 380 U.S. 278, 291 (1965).

### III. DISCUSSION

Defendants argue that the rule is a proper exercise of the Board's rulemaking

authority under Section 6 of the Act. Alternatively, defendants argue that the rule is a

reasonable exercise of the Board's authority to fill a statutory "gap" in the Act left by

Congress. The parties agree that the court must review the legal sufficiency of the

Board's rule under the APA by applying the two-step analysis set forth in Chevron

U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837 (1984).

### A. Chevron Analysis

"Chevron deference is a tool of statutory construction whereby courts are

instructed to defer to the reasonable interpretations of expert agencies charged by

Congress to fill any gap left, implicitly or explicitly, in the statutes they administer."

Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy, 654 F.3d 496, 504 (4th Cir. 2011)

(internal quotation marks omitted). Chevron applies when courts are asked to review

notice-and-comment rulemaking efforts by agencies. See United States v. Mead, 533

U.S. 218, 230-31 (2001). This court is therefore "confronted with two questions," i.e.,

Chevron "step one" and "step two." "First, always, is the question whether Congress has

directly spoken to the precise question at issue," and "[i]f the intent of Congress is clear,

12

that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43. If, however, Congress "has not directly addressed the precise question," the question under step two is "whether the agency's answer is based on a permissible construction of the statute." Id. at 843-44.

**B.  Chevron Step One**

The question presented under Chevron step one is whether Congress delegated authority to the Board to regulate employers in this manner.[5] See Brown & Williamson Tobacco Corp. v. FDA, 153 F.3d 155, 161 (4th Cir. 1998) ("The district court framed the issue as 'whether Congress has evidenced its clear intent to *withhold* from FDA jurisdiction to regulate tobacco products as customarily marketed.' However, we are of opinion that the issue is correctly framed as whether Congress intended to *delegate* such jurisdiction to the FDA."). The court must only employ the deference of Chevron step two when the "devices of judicial construction have been tried and found to yield no clear sense of congressional intent." Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 583 (2004). Even when a statute is silent as to a specific issue, before applying Chevron deference under step two, the court must ask whether "Congress either explicitly or implicitly delegated authority to cure that ambiguity." Am. Bar Ass'n v. FTC, 430 F.3d 457, 469 (D.C. Cir. 2005). "[I]t is only legislative intent to delegate such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of *Chevron*." NRDC v. Reilly, 983 F.2d 259, 266 (D.C. Cir.

---

[5] In the remainder of the order, the court focuses on whether the Board has the legal authority to promulgate the requirement in Subpart A of the rule, which requires employers to post the notice. As conceded by the parties at oral argument, the court's holding on this issue is dispositive as to the remaining contested portions of the rule.

1993) (internal quotation marks omitted); <u>see also</u> <u>Texas v. United States</u>, 497 F.3d 491, 502 (5th Cir. 2007).

To ascertain congressional intent, courts rely on the "traditional tools of statutory construction." <u>Brown & Williamson</u>, 153 F.3d at 161. Statutory construction begins with the language of the statute, as "the plain language of the statute in question is deemed the most reliable indicator of Congressional intent." <u>Soliman v. Gonzales</u>, 419 F.3d 276, 281-82 (4th Cir. 2005). The court must "look to the statutory language as a whole, construing each section in harmony with every other part or section." <u>Id.</u> at 282. Context also plays a "crucial role" in statutory construction; "[t]hus, the traditional rules of statutory construction to be used in ascertaining congressional intent include: the overall statutory scheme, legislative history, the history of evolving congressional regulation in the area, and a consideration of other relevant statutes." <u>Brown & Williamson</u>, 153 F.3d at 162 (citations and internal quotation marks omitted).

### 1. Section 6

Defendants first assert that the Board reasonably relied on its broad rulemaking grant in Section 6 to issue a rule that is "necessary to carry out" other provisions of the NLRA. Section 6 provides, "The Board shall have authority from time to time to make, amend, and rescind, in the manner prescribed by the Administrative Procedure Act, such rules and regulations as may be necessary to carry out the provisions of this Act." 29 U.S.C. § 156.[6] This statutory grant gives the Board wide discretion to enact rules and

---

[6] The language of Section 6 is not unique to the NLRA; its counterparts are scattered throughout the United States Code. <u>See, e.g.</u>, Securities Act of 1933, 15 U.S.C. § 77s(a) ("The Commission shall have authority from time to time to make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this subchapter . . . ."); Communications Act of 1934, 47 U.S.C. § 154(i) ("The [FCC] may . . . make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions.");

regulations, but it also tailors the Board's authority to rules and regulations that both comply with the APA *and* are *necessary* to carry out other provisions of the Act. The question, then, becomes whether the notice-posting rule is "necessary" to carry out other sections of the Act.

Interpretation of Section 6 is terra incognita. Courts have rarely explored the parameters of Section 6, the reason being that the Board has rarely exercised its rulemaking authority.[7] In 1987, following calls for increased rulemaking, the Board issued its first broad-scale substantive rule, a health care unit rule that established appropriate bargaining units in acute care hospitals. The American Hospital Association challenged the rule, arguing that Section 9(b) of the Act, which requires the Board to make bargaining unit determinations "in each case,"[8] limits the Board from using its general rulemaking power under Section 6 to define bargaining units.

The district court enjoined the rule. On appeal to the Seventh Circuit, Judge Posner, writing for the panel, reversed, holding that the Board's rulemaking power was

---

Clean Air Act Amendments of 1977, 42 U.S.C. § 7601(a)(1) ("The Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this chapter."). See also Thomas W. Merrill & Kathryn Tongue Watts, Agency Rules with the Force of Law: The Original Convention, 116 Harv. L. Rev. 467, 471 n.8 (2002) ("According to one report, by January 1, 1935, more than 190 federal statutes included rulemaking grants that gave agencies power to 'make any and all regulations 'to carry out the purposes of the Act.'' Report of the Special Committee on Administrative Law, 61 Ann. Rep. A.B.A. 720, 778 (1936).").

[7] The Supreme Court held in NLRB v. Bell Aerospace Co., 416 U.S. 267 (1974), that the Board bears the ultimate choice between rulemaking and adjudication. Still, the Board has traditionally relied on adjudication to formulate its policies. See Mark H. Grunewald, The NLRB's First Rulemaking: An Exercise in Pragmatism, 41 Duke L.J. 274, 274 (1991) ("Despite having been granted both rulemaking and adjudicatory power in its statutory charter more than half a century ago, the National Labor Relations Board has chosen to formulate policy almost exclusively through the process of adjudication."); Cornelius J. Peck, The Atrophied Rule-Making Powers of the National Labor Relations Board, 70 Yale L.J. 729, 729 (1961) (noting "the Board's failure to utilize its rule-making powers").

[8] Section 9(b) provides, "The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof . . . ." 29 U.S.C. § 159(b).

"explicit and broad" enough to encompass the health care units rule.  <u>Am. Hosp. Ass'n v. NLRB</u>, 899 F.2d 615, 655 (7th Cir. 1990).  Because Congress granted the Board explicit rulemaking power in Section 6 at the same time it enacted Section 9(b), Judge Posner found, "it is probable (no stronger statement is possible) that Congress would have made an explicit exception for unit determination if it had wanted to place that determination outside the scope of the Board's rulemaking power."  <u>Id.</u> at 656.  "The broad discretion that the statute grants the Board *in the matter of unit determination* is an invitation to the Board to bring order out of chaos through rules . . . ."  <u>Id.</u> (emphasis added).

The Supreme Court unanimously affirmed.  <u>Am. Hosp. Ass'n v. NLRB</u>, 499 U.S. 606 (1991) ("<u>AHA</u>").  First, the Court touched upon the Board's rulemaking authority under Section 6, stating, "This grant was unquestionably sufficient to authorize *the rule at issue in this case* unless limited by some other provision in the Act."  <u>Id.</u> (emphasis added).  Second, the Court found that the Board could carry out its duty to make bargaining unit determinations "in each case," either through rulemaking or adjudication.  "[E]ven if a statutory scheme requires individualized determinations," the Court wrote, "the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority."  <u>Id.</u> at 612.  Third, the Court looked to the structure and policy of the NLRA: "As a matter of statutory drafting, if Congress had intended to curtail in a particular area the broad rulemaking authority granted in § 6, we would have expected it to do so in language expressly describing an exception from that section or at least referring specifically to the section."  <u>Id.</u>

AHA was decided under Chevron step one, in that the Court found Section 9(b) unambiguously did not limit the Board's authority under Section 6, but instead delegated the authority (and obligation) to the Board to make bargaining unit determinations either through rulemaking or adjudication. As noted by Judge Posner, Congress gave the Board wide discretion in the area of bargaining unit determinations. 899 F.2d at 656. Coupled with the Board's similarly-broad authority under Section 6, the Court found that the Board had unambiguous authority to promulgate a rule "necessary to carry out" Section 9(b).[9]

Here, defendants maintain that the Board's Section 6 authority is broad enough to encompass the notice-posting rule. The court disagrees. The plain language and structure of the Act compel a finding that the Board lacks authority under Section 6 to promulgate the rule.

### a.  Plain Language

First, the plain language of Section 6 requires that rules promulgated by the Board be "necessary to carry out" other provisions of the Act. Defendants argue that the rule is "necessary to carry out" Sections 1 and 7 of the Act, but confuse a "necessary" rule with one that is simply useful. It can be said that the notice-posting rule "aids" or "furthers" the aspirational goals of Section 1 by notifying employees of their rights under Section 7, but defendants have not shown that the rule is "necessary" to carry out any other provision of the Act. Unlike the rule in AHA wherein Congress specifically listed the

---

[9] Although not mentioned by the Court in AHA, the House of Representatives passed a bill in 1977 called the Labor Reform Act, which provided that the Board "shall, to the fullest extent practicable, exercise its authority under [Section 6] to promulgate rules declaring certain units to be appropriate for the purposes of collective bargaining." H.R. 8410, 95th Cong. § 3 (1977); see Merrill & Watts, supra, at 567. The bill was eventually defeated in the Senate, but Congress had at least considered that the Board could promulgate bargaining unit rules such as the one at issue in AHA.

types of bargaining units and required the Board to decide the appropriate unit in each case, the Act places no affirmative obligation on employers to post notices of employee rights or inform employees of those rights, so the rule cannot be "necessary" to carry out such a nonexistent provision.

Defendants urge the court to adopt a lenient interpretation of "necessary to carry out" and rely on a pre-Chevron line of cases, including Mourning v. Family Publications Service, Inc., 411 U.S. 356, 359 (1973), which held that where an agency is empowered to "'make . . . such rules and regulations as may be necessary to carry out the provisions of [an] Act,' . . . a regulation promulgated thereunder will be sustained so long as it is reasonably related to the purposes of the enabling legislation." At first blush, Mourning appears to support defendants' contention that the notice-posting rule is permissible because it "reasonably relates" to the purposes the Act found in Sections 1 and 7. However, courts have declined to follow this approach when doing so would give the agency "limitless power to write new law, without any regard for the language or legislative history of the governing statute, so long as it arguably fits within the purposes of the statutory scheme." Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n, 383 F. Supp. 2d 123, 143-44 (D.D.C. 2005), aff'd, 466 F.3d 134, 139 (D.C. Cir. 2006) ("An agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority.").[10] The Board may not disregard restrictions Congress has imposed on its authority in other sections of the governing statute by relying on Section 6 in isolation to these substantive provisions. See Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Chao, 409 F.3d 377, 384 (D.C. Cir. 2005)

---

[10] Courts also view Mourning as providing a heightened level of deference to the agency's interpretation of its statute under Chevron step *two*, rather than under step one. Colo. River Indian Tribes, 383 F. Supp. 2d at 144.

("Even when Congress has stated that the agency may do what is 'necessary,' whatever ambiguity may exist cannot render nugatory restrictions that Congress has imposed.").

As discussed below, the structure of the Act places the Board in a reactive role in relation to employers covered by the Act.  Finding that the challenged rule is "necessary" to carry out other provisions of the Act would require the court to ignore "the statutory language as a whole," Soliman, 419 F.3d at 281-82, and allow the Board to create rules in any area in which Congress did not specifically *withhold* the Board's power.  Contra Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd., 29 F.3d 655, 659 (D.C. Cir. 1994) (en banc). The court must be guided by the plain meaning of the word "necessary" and the statutory framework that channels the Board's powers away from proactive regulation of employers to a mechanism whereby the Board's functions are triggered by an outside party.  See 29 U.S.C. §§ 158-160; Local 357, Int'l Bhd. of Teamsters v. NLRB, 365 U.S. 667, 676-77 (1961) ("[W]here Congress has adopted a selective system for dealing with evils, the Board is confined to that system . . . [and] cannot go farther and establish a broader, more pervasive regulatory scheme."); Pub. Serv. Comm'n of State of N.Y. v. FERC, 866 F.2d 487, 491-92 (D.C. Cir. 1989) (finding agency's expansive reading of its authority to "perform any and all acts" and make rules "necessary or appropriate to carry out the provisions of this chapter" was contrary to balance achieved by other substantive sections of the Act).  The notice-posting rule contradicts both the plain meaning of Section 6 and the balance achieved by the statutory framework.[11]

---

[11] Congress clearly wanted the Board to "encourage the practice and procedure of collective bargaining" and "protect[] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing," 29 U.S.C. § 151, but in a particular way—i.e., in reaction to a petition or charge being filed, or through a rule, like in AHA, that carries out the Board's enumerated duties delegated by Congress.  For over seventy-five years, the Board has carried out its duties of protecting employees' collective bargaining rights,

Neither Section 6 nor any other section of the NLRA even mentions the issue of notice posting.[12] "[L]ook[ing] to the statutory language as a whole," the text of the Act shows that the Board's rule is not "necessary to carry out" any provision of the Act. <u>Soliman</u>, 419 F.3d at 282.

### b.  Structure of the Act

In addition to the plain language of the Act, the court must consider "the specific context in which the language is used," along with "the broader context of the statute as a whole."  <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 341 (1997).

Congress authorized the Board to regulate employers' conduct in two essential areas:  preventing and resolving ULP charges and conducting representation elections.  It is clear from the structure of the Act that Congress intended the Board's authority over employers to be triggered by an outside party's filing of a representation petition or ULP charge.  <u>See</u> 29 U.S.C. § 159(c) (permitting a Board investigation, hearing, and election on a representation repetition only when "a petition shall have been filed"); <u>id.</u> § 160(b) ("Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board . . . shall have power to issue . . . a complaint . . . .").

It is in this context that the Board's Section 6 authority is elucidated.  The notice-posting rule proactively dictates employer conduct prior to the filing of any petition or charge, and such a rule is inconsistent with the Board's reactive role under the Act.  Defendants read <u>AHA</u> as standing for the proposition that any rule made under Section 6 is lawful so long as some other provision of the Act does not specifically limit the

---

preventing and remedying ULPs, and conducting representation elections without proactively requiring employers to post notices of employee rights.
[12] By contrast, in the Railway Labor Act and other federal labor statutes, Congress expressly required notice posting.

Board's rulemaking authority.  This reading is mistaken.  In AHA, the Board determined that the bargaining units rule was "necessary to carry out" Section 9(b), which *required* the Board to make bargaining unit determinations "in each case."  Moreover, the bargaining units rule defined how the Board would handle issues *after* the Board's adjudicative authority was triggered.  Here, the notice-posting rule does not serve to "carry out" any existing duties under the Act, but instead places an affirmative obligation on employers prior to a charge or petition first being filed.  Congress did not impose a notice-posting requirement on employers in the Act or commit this area of regulation to the Board.  "Where Congress has in the statute given the Board a question to answer, the courts will give respect to that answer; but they must be sure the question has been asked."  NLRB v. Ins. Agents' Int'l Union, 361 U.S. 477, 499 (1960).

Defendants have not shown that Congress delegated authority to the Board through Section 6 to regulate employers in this manner.  "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."  Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988).  Defendants view the Act, as well as the Supreme Court's holding in AHA, as providing the Board with unbridled rulemaking discretion so long as Congress did not say "no."  Courts have repeatedly rejected such a presumption of authority.  See, e.g., Am. Petroleum Inst. v. EPA, 52 F.3d 1113, 1120 (D.C. Cir. 1995) ("[W]e will not presume a delegation of power based solely on the fact that there is not an express withholding of such power."); Ry. Labor Execs.' Ass'n, 29 F.3d at 659 (same).  The Board cannot simply hang its hat on Congress's silence, especially when the authority asserted here conflicts with the Board's historic "quasi-judicial" role in relation to

employers under the Act.  As stated by the Supreme Court in an adjudicative context, "[T]he role assumed by the Board in this area is fundamentally inconsistent with the structure of the Act and the function of the sections relied upon."  Am. Ship Bldg. Co. v. NLRB, 380 U.S. 300, 318 (1965).  Where Congress has prescribed the form in which the Board may exercise its authority—in this case, in reaction to a charge or petition—this court "cannot elevate the goals of an agency's action, however reasonable, over that prescribed form."  Amalgamated Transit Union v. Skinner, 894 F.2d 1362, 1364 (D.C. Cir. 1990).  To do so would allow deference owed to agencies to "slip into a judicial inertia," resulting in the "unauthorized assumption by an agency of major policy decisions properly made by Congress."  Am. Ship Bldg. Co., 380 U.S. at 318.

The court does not discredit the Board's factual finding of a need for the notice-posting rule.  It may or may not be true that an increased need exists today for employees to learn of their NLRA rights; the court respects the Board's decision on that issue, as expert agencies like the Board are granted leeway to make factual determinations.[13]  The problem with the Board's argument "is not the soundness of its labor policy," as "the Board is entitled to judge that without our constant second-guessing"; it "is that the policy cannot be given effect through this statutory text."  NLRB v. Ky. River Cmty. Care, Inc., 532 U.S. 706, 720 (2001).

Based on the plain language and structure of the Act, the court finds that the Board lacks authority under Section 6 to promulgate the notice-posting rule.

---

[13] As the Court stated in Republic Aviation Corp. v. NLRB, 324 U.S. 793, 800 (1945), "One of the purposes which lead to the creation of such boards is to have decisions based upon evidential facts under the particular statute made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration."  Here, the Board's interpretation of the rule does not incorporate any labor-related expertise. See Hi-Craft Clothing Co., 660 F.2d at 918 ("This is not a question of the Board applying a broad statutory term to a specified set of facts, but is a case of straightforward statutory construction.").

### 2.  The Meaning of Silence

Defendants next argue that in promulgating the rule, the Board reasonably exercised its authority to fill a statutory "gap" left by Congress in the NLRA.  The Board concedes that the NLRA "does not directly address an employer's obligation to post a notice of its employees' rights arising under the Act or the consequences an employer may face for failing to do so."  76 Fed. Reg. at 54,010.  Because the statute is "silent" as to notice posting, the court must look beyond the plain language of the statute to determine whether Congress intended to delegate authority to the Board to fill this legislative silence, by considering "the overall statutory scheme, legislative history, the history of evolving congressional regulation in the area, and . . . other relevant statutes."  Brown & Williamson, 153 F.3d at 162 (citations and internal quotation marks omitted).  The court takes these considerations in turn.

### a.  Statutory Scheme

First, as discussed above, the NLRA, when considered as a whole, shows that Congress intended for the Board to be a reactive, quasi-judicial body with two primary functions:  preventing and resolving ULP charges and conducting representation elections.  Upon signing the final bill into law, President Roosevelt described the Board's authority as such:  "[the Act] establishes a National Labor Relations Board to hear and determine cases in which it is charged [that the] legal right [to self-organization] is abridged or denied, and to hold fair elections to ascertain who are the chosen representatives of employees."  Presidential Statement on Signing the National Labor Relations Act of 1935, reprinted in 2 NLRB, Legislative History of the National Labor Relations Act, 1935, at 3269 (1935) (hereinafter "Leg. Hist.").  Still today, the Board

acknowledges that it "has two main functions:  to conduct representation elections . . . and to prevent employers and unions from engaging in unfair labor practices."  NLRB, Basic Guide, at 33.

As in many statutes of its kind, Congress further authorized the Board to create rules and regulations necessary to carry out these essential functions, as the Board did in AHA.  Unlike the rule in AHA, the challenged rule is not necessary to carry out the Board's essential functions, as discussed above.  The Board may not promulgate rules that enlarge its authority beyond the scope intended by Congress.  Gen. Eng'g, Inc. v. NLRB, 341 F.2d 367, 374 (9th Cir. 1965).  By promulgating a rule that proactively imposes an obligation on employers prior to the filing of a ULP charge or representation petition, in the absence of express statutory authority, the Board has contravened the statutory scheme established by Congress.  See Civil Serv. Emps. Ass'n v. NLRB, 569 F.3d 88, 91 (2d Cir. 2009) (quoting NLRB v. Local Union No. 103, 434 U.S. 335, 350 (1978)) ("[D]eference is not owed when the NLRB moves 'into a new area of regulation which Congress [has] not committed to it.'").

### b.  Legislative History

Next, the legislative history of the Act supports a finding that Congress did not intend to impose an universal notice-posting requirement on employers, nor did it authorize the Board to do so.  Senate Reports on early versions of the Act state that the

> quasi-judicial power of the Board is restricted to [the enumerated] unfair labor practices and to cases in which the choice of representatives is doubtful.  And even then the Board's compulsory action is limited to cases that had led or threaten to lead to labor disputes that might affect commerce or obstruct the free flow of commerce.

S. Rep. No. 73-1184 (1934), reprinted in 1 Leg. Hist. at 1100.  A similar Report found, "Neither the National Labor Relations Board nor the courts are given any blanket

authority to prohibit whatever labor practices that in their judgment are deemed to be unfair."  S. Rep. No. 74-573 (1935), reprinted in 2 Leg. Hist. at 2307-08; see also H.R. Rep. No. 74-969, reprinted in 2 Leg. Hist. at 2919 (describing Section 11 of the Act, which gives investigatory powers to the Board, as "grant[ing] no roving commission," but instead limiting the Board "to the exercise of powers and functions embodied in sections 9 and 10").  Such statements reveal Congress's intent to place the Board in a primarily adjudicative role in relation to employers.  See NLRB v. Jones & Laughlin Steel Corp., 310 U.S. 1, 31-32 (1935) (emphasis added) (holding that Congress's grant of authority to the Board "purports to reach only what may be deemed to burden or obstruct commerce," which is "to be determined *as individual cases arise*").[14]

### c. Evolving Congressional Regulation and Other Relevant Statutes

Furthermore, the history of congressional regulation in the labor field and a review of other relevant statutes reveal Congress's intent to preclude the imposition of a general notice-posting requirement on employers subject to the NLRA.  In 1934, at the same time it was drafting the Wagner Act, Congress amended the Railway Labor Act ("RLA") to include an express notice-posting requirement.  See 45 U.S.C. § 152, Eighth (1934).  This notice provision provides in part,

---

[14] The legislative history also reveals that Congress intended for the Board to use its Section 6 authority to carry out its essential duties of preventing and remedying ULPs and conducting representation elections.  To illustrate, a House Report accompanying H.R. 7978, a predecessor to the final bill, references Congress's expectation that Section 6 would be used to create rules applicable to representation elections under Section 9:  "Section 9 . . . makes provision for elections to be conducted by the Board or its agents or agencies to ascertain the representatives of employees. . . . It is, of course, contemplated that pursuant to its authority under section 6 . . ., the Board will make and publish appropriate rules governing the conduct of elections and determining who may participate therein."  H.R. Rep. 74-969 (1935) (Rep. Connery), reprinted in 2 Leg. Hist. at 2930.

> Every carrier shall notify its employees by printed notices in such form and posted at such times and places as shall be specified by the Mediation Board that all disputes between the carrier and its employees will be handled in accordance with the requirements of this chapter, and in such notices there shall be printed verbatim, in large type, the third, fourth, and fifth paragraphs of this section.

Id.  Paragraphs 3, 4, and 5 of Section 152 of the RLA list various rights of employees, including:  the right to designation of representatives without interference, influence, or coercion; the right of employees to organize and bargain collectively through representatives of their own choosing; and the right of persons seeking employment to abstain from an agreement to join or not to join a labor organization.  In this case, the Board similarly seeks to require employers to notify employees via printed notices of their statutory rights; however, Congress did not impose such an obligation in the NLRA, despite doing so in the RLA.  "[W]hen Congress legislates in one area with explicit reference in a statute on an area of concern, but fails to reference that same subject matter in another statute, its silence is evidence that Congress did not intend for there to be applicability in the latter statute."  N.Y. State Bar Ass'n v. FTC, 276 F. Supp. 2d 110, 135 (D.D.C. 2003).[15]

Congress has inserted at least eight additional notice requirements in federal labor laws since 1934, while the NLRA remained silent.  See Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-10 (1964); Age Discrimination in Employment Act, 29 U.S.C. § 627 (1967); Occupational Safety and Health Act, 29 U.S.C. § 657(c) (1970); Migrant and Seasonal Agricultural Workers Protection Act, 29 U.S.C. § 1821(b) (1983); Employee

---

[15] As pointed out by amici, in 1934 and 1935, Congress originally considered including a notice-posting provision in the NLRA.  This provision would have required employers to notify employees if they were party to a contract that conflicted with a provision of the NLRA and would be abrogated.  This provision was ultimately rejected.  After reviewing the legislative history, the court finds that the 1934-1935 notice provision is not particularly relevant to the notice-posting rule at issue in this case.

Polygraph Protection Act, 29 U.S.C. § 2003 (1988); Americans with Disabilities Act, 42

U.S.C. § 12115 (1990); Family and Medical Leave Act, 29 U.S.C. § 2619(a) (1993);

Uniformed Service Employment and Reemployment Rights Act, 38 U.S.C. § 4334(a)

(2004).  Congress clearly knows how to include a notice-posting requirement in a federal

labor statute when it so desires.  "Where Congress has consistently made express its

delegation of a particular power, its silence is strong evidence that it did not intend to

grant the power."  Alcoa S.S. Co. v. Fed. Mar. Comm'n, 348 F.2d 756, 758 (D.C. Cir.

1965).  Less than eight years ago, Congress *amended* the Uniformed Services

Employment and Reemployment Rights Act of 1994 ("USERRA") to impose a new

requirement:  "Each employer shall provide to persons entitled to rights and benefits

under [USERRA] a notice of the rights, benefits, and obligations of such persons and

such employers under [USERRA]."  Veterans' Benefits Improvements Act of 2004, 33

U.S.C. § 4344(a).  Congress's continued silence in the NLRA is indicative of its intent.

See Brown & Williamson, 529 U.S. at 153 ("[T]he meaning of one statute may be

affected by other Acts, particularly where Congress has spoken subsequently and more

specifically to the topic at hand.").[16]

     Despite its explicit inclusion of notice-posting obligations in these numerous

federal statutes during the twentieth and twenty-first centuries, Congress made extensive

revisions to the NLRA in 1947, 1959, and 1974, yet never found the need to include a

notice-posting provision.  The Board also went seventy-five years without promulgating a

---

[16] If this analysis is considered a use of the maxim expression unius est exclusion alterius, "the mention of one thing implies the exclusion of another," then this court notes that it has not used the maxim "as a starting point in statutory construction [but] as a close-out bid."  Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth., 132 F.3d 775, 782 (D.C. Cir. 1998).  Cf. Cheney R.R. Co. v. ICC, 902 F.2d 66, 69 (D.C. Cir. 1990) (calling the maxim into doubt).

notice-posting rule, but it has now decided to flex its newly-discovered rulemaking

muscles.

> [A] court may accord great weight to the longstanding interpretation
> placed on a statute by an agency charged with its administration. This is
> especially so where Congress has re-enacted the statute without pertinent
> change. In these circumstances, congressional failure to revise or repeal
> the agency's interpretation is the one intended by Congress.

Bell Aerospace, 416 U.S. at 274-75 (footnotes omitted).[17]

Based on the statutory scheme, legislative history, history of evolving

congressional regulation in the area, and a consideration of other federal labor statutes,

the court finds that Congress did not intend to impose a notice-posting obligation on

employers, nor did it explicitly or implicitly delegate authority to the Board to regulate

employers in this manner.

### d. Gap-Filling Authority

Finally, the court reiterates that the Board's discovery of a "gap" in the statute

does not automatically entitle it to deference under Chevron step two. In Chevron, the

Court found that Congress had implicitly delegated authority to the Environmental

Protection Agency ("EPA") to interpret a two-word term, "stationary source," found in

the Clean Air Act Amendments of 1977. 467 U.S. at 840. The Court reasoned that the

meaning of "stationary source" was ambiguous in the statute and legislative history, and

that Congress intended to enlarge the agency's power to regulate in the particular area in

question. Since Chevron was decided, courts have found that Chevron "deference is

---

[17] The court recognizes that the Board is not legally bound by its past constructions of its
authority, and that "neither antiquity nor contemporaneity with [a] statute is a condition of [a
rule's] validity." Mayo Found. for Med. Educ. & Research v. United States, 131 S. Ct. 704, 712
(2011); Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981 (2005).
The court focuses on the fact that since 1935, *Congress* has neither included a notice-posting
requirement in the NLRA nor committed this area of regulation to the Board.

warranted *only* when Congress has left a gap for the agency to fill pursuant to an express

or implied delegation of authority to the agency."

> To suggest . . . that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power (*i.e.* when the statute is not written in 'thou shalt not' terms), is both flatly unfaithful to the principles of administrative law . . . and refuted by precedent.  Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.

Ry. Labor Execs.' Ass'n, 29 F.3d at 671; see also Sea-Land Serv., Inc. v. Dep't of

Transp., 137 F.3d 640, 645 (D.C. Cir. 1998).

Unlike Chevron, where specific words in the statute were ambiguous, the NLRA

is completely silent as to a notice-posting requirement.  Only in this sense is the NLRA

"ambiguous."  But "[m]ere ambiguity in a statute is not evidence of congressional

authority."  Michigan v. EPA, 268 F.3d 1075, 1082 (D.C. Cir. 2001); see Stephen Breyer,

Judicial Review of Questions of Law and Policy, 38 Admin. L. Rev. 363, 373 (1986)

("To read *Chevron* as laying down a blanket rule, applicable to all agency interpretations

of law, such as 'always defer to the agency when the statute is silent,' would be seriously

overbroad, counterproductive and sometimes senseless.").

Defendants stretch the basic meaning of a "gap" in a statute.  In the ordinary case,

a specific term in the statute is ambiguous and Congress was silent as to its meaning.  See

Emergency Servs. Billing Corp. v. Allstate Ins. Co., No. 11-2381, 2012 WL 313578, at

*4 (7th Cir. Feb. 2, 2012) (emphasis added) ("[D]eference must be given to an agency's

interpretation of its own statute if that statute has a gap—*that is, if a key term is*

*ambiguous and Congress was silent as to its meaning*.").  But here, there is no statutory

language in the NLRA that requires employers to inform employees of their Section 7

rights.  Only then, if some related language was ambiguous or lacking, could there be a gap for the Board to fill.  Yet there is not a single trace of statutory text that indicates Congress intended for the Board to proactively regulate employers in this manner.  See Nat'l Elec. Mfrs. Ass'n, 654 F.3d at 520 (Shedd, J., dissenting) ("What DOE proposes is not gap-filling; it is misreading congressional intent to justify an agency claiming more authority.  No Supreme Court or Fourth Circuit case requires us to take such a drastic step with this statute . . . .").  Courts "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency."  Brown & Williamson, 529 U.S. at 133; Breyer, supra, at 370 ("A court may also ask whether the legal question is an important one.  Congress is more likely to have focused upon, and answered, major questions, while leaving interstitial matters to answer themselves in the course of the statute's daily administration.").[18]  Since Congress has required notice posting in at least nine other federal labor statutes, notice posting is clearly a major question, not an interstitial matter.

　　　As the Supreme Court stated fifty-two years ago, "Where Congress has in the statute given the Board a question to answer, the courts will give respect to that answer; but they must be sure the question has been asked."[19]  Ins. Agents' Int'l Union, 361 U.S. at 499.  The court holds that the Board lacks authority to promulgate the notice-posting rule based on its discovery of a "gap" left in the Act by Congress.

---

[18] See also Christensen v. Harris Cty., 529 U.S. 576, 589 n* (2000) (Scalia, J., concurring in part and concurring in judgment) ("The implausibility of Congress's leaving a highly significant issue unaddressed (and thus 'delegating' its resolution to the administering agency) is assuredly one of the factors to be considered *in determining whether there is ambiguity*.").

[19] Perhaps the Board should have heeded the admonition of Simon and Garfunkle:  "And no one dared / disturb the sound of silence."  Simon & Garfunkle, The Sound of Silence, on Sounds of Silence (Columbia Records 1966).

## IV.  CONCLUSION

After utilizing the tools of statutory interpretation, the court finds that the Board lacks the authority to promulgate the notice-posting rule.  As such, the rule is unlawful under the APA, 5 U.S.C. § 706, and the court **GRANTS** summary judgment in favor of plaintiffs.[20]

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**April 13, 2012**
**Charleston, South Carolina**

---

[20] As the court decides this case on <u>Chevron</u> step one grounds, it need not reach defendants' arguments under <u>Chevron</u> step two.  The court does note that if it were to reach <u>Chevron</u> step two, it would agree with Judge Jackson's fine opinion in <u>National Ass'n of Manufacturers v. NLRB</u>, No. 11-1629, 2012 WL 691535 (D.D.C. Mar. 2, 2012), and find that the Board "articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  <u>Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).  Plaintiffs also argue that the Board's rule violates the First Amendment and the RFA.  Because the court holds that the Board lacks authority to promulgate the rule, these remaining issues are moot.